# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID TOPAZIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 10 C 4702 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| AETNA LIFE INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff David Topazian filed the instant suit against his insurer, Defendant Aetna Life Insurance Company, to challenge Aetna's decision to deny him long-term disability benefits under his policy. He brings his suit pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). Both sides now move for judgment on the administrative record pursuant to Rule 52 of the Federal Rules of Civil Procedure. For the reasons stated below, the Court DENIES Plaintiff's motion and GRANTS Defendant's motion.

### I. Standard of review

The parties to this case agree that all of the facts to be reviewed in this case are contained within the administrative record. They therefore move for judgment pursuant to Rule 52 because the proper procedure in this case, like other challenges to benefit denials under ERISA, "is more akin to a bench trial than to a summary judgment ruling." *See Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (approving the use of Rule 52 in a similar case). Nonetheless, in order to facilitate the Court's role in finding facts in the absence of a bench trial, the parties submitted statements of facts consistent with Local Rule 56.1, which governs

1

summary judgment motions. Thus, using these factual statements, the Court sets forth its factual findings and legal rulings below.

The parties also agree that Topazian's policy gave Aetna discretion to interpret policy language and make benefit eligibility determinations. *See* Findings of fact, *infra*, at ¶ 2. Thus, the Court must give substantial deference to Defendant's decision, overturning it only if it was arbitrary and capricious. *Tate v. Long Term Disability Plan for Salaried Employees of Champion Intern. Corp. # 506*, 545 F.3d 555, 559 (7th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S Ct. 948, 103 L. Ed. 2d 80 (1989)). But, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S. Ct. at 957 (internal quotations omitted). The Supreme Court has held that a plan administrator that both evaluates and pays claims for benefits, such as Aetna does in this case, *see* Findings of fact, *infra*, at ¶ 3, operates under the type of conflict of interest described in *Firestone*. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S. Ct. 2343, 2348, 171 L. Ed. 2d 299 (2008). Given that this conflict of interest is only one factor to be considered among many, however, the Court avoided providing "detailed instructions," a "precise standard," or "talismanic words" regarding its impact. *Id.* at 119, 128 S. Ct. at 2352. Instead, the Court provided the following guidance to reviewing courts:

> [A]ny one factor [in the analysis of the insurer's decision] will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator

> has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 117, 128 S. Ct. at 2351 (internal citations omitted).

In this case, Topazian presents no evidence that Aetna has a history of biased claims administration. He also concedes that Aetna has set forth some evidence that it has taken steps to reduce potential bias. Nonetheless, Topazian argues that Aetna's decisionmaking in this case is indicative of bias because it has shifted its explanations for denying Topazian's claim for benefits over time. *See Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 777-78 (7th Cir. 2010) (finding an administrator's shifting demands to be evidence of a conflict of interest). This alleged "moving of the target," is also an "independent factor in the arbitrary-and-capricious inquiry," however, and so the Court addresses the merit of Topazian's argument along with the rest in its review of that inquiry below. *See id.*

## II. Findings of fact

1. Effective May 30, 2008, Topazian received coverage for long-term disability (LTD) benefits under the insurance policy at issue in this case pursuant to his employment. (Pl. St. of Facts (hereinafter "Pl. St.") ¶ 7; Def. St. of Facts (hereinafter "Def. St.") ¶ 3.) He was a "participant" under the policy, as defined by 29 U.S.C. § 1002(1). (Pl. St. ¶ 7.)

2. The policy provided coverage through an "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1). (Pl. St. ¶ 7.)

3. Aetna is the underwriter and insurer of the policy, (Pl. St. ¶ 6), and has discretionary authority under the policy to make benefit eligibility determinations and construe the policy's terms, (Def. St. ¶ 4).

4. The policy contains the following "pre-existing condition" limitation on LTD benefits:

> No benefit is payable for any disability that is caused by or contributed to by a "pre-existing condition" and starts before the end of the first 12 months following [the participant's] effective date of coverage.
> A disease or injury is a pre-existing condition if, during the 3 months before [the participant's] effective date of coverage:
> - it was diagnosed or treated; or
> - services were received for the diagnosis or treatment of the disease or **injury**; or
> - [the participant] took drugs or medicines prescribed or recommended by a **physician** for that condition.

(Def. St. ¶ 6 (emphasis in original).)

5. Beginning in 1998, Topazian experienced and received treatment for lower back pain on both the left and right sides. (Def. St. ¶¶ 7-8.)

6. In 1999, Topazian began to experience intense lower back pain and right lower extremity pain and weakness. (Def. St. ¶ 9.)

7. In March 1999, Topazian was diagnosed with a right S1 radiculopathy, or a "herniated disc." An MRI of his lumbar spine revealed a rightward herniated disc encroaching on the thecal sac and the right S1 nerve root. The MRI report also indicated "minimal encroachment" on the left S1 nerve root. (Aetna Topazian Claim 1147.[1]) There was also some central disc herniation at L4-5 encroaching slightly on the thecal sac. (Pl. St. ¶ 17.)

---

[1] "Aetna Topazian Claim" page numbers refer to the administrative record.

4

8. In February 2000, as a result of skiing, Topazian experienced increasing pain down his right leg and some numbness and cramping. (Pl. St. ¶ 18; Def. St. ¶ 11.)

9. A repeat MRI exam on February 27, 2000 revealed a 1 cm central and right paracentral disc extrusion at L5-S1 with compromise of the right S1 nerve root with central disc protrusion at L4-5. (Pl. St. ¶ 18.)

10. On May 11, 2000, Topazian underwent back surgery, more specifically a right-sided microdiskectomy at L5-S1. (Def. St. ¶ 13.)

11. Following his surgery, Topazian received physical therapy until July 15, 2000, when he was discharged with overall improvement in symptoms but continued central low back pain and occasional left lower extremity numbness in the posterior leg. (Def. St. ¶ 14; Pl. Resp. to Def. St. (hereinafter "Pl. Resp.") ¶ 14.)

12. In January 2003, Topazian began having increasing back pain and recurrent symptoms of leg pain. (Def. St. ¶ 15.)

13. On January 14, 2003, Topazian received a lumbar epidural steroid injection. (Def. St. ¶ 16.)

14. An MRI dated February 4, 2003 showed that Topazian had lower lumbar spondylosis with broad right paracentral protrusion at L5-S1, which had a compression effect on his descending right S1 nerve root. (Pl. St. ¶ 19.)

15. On May 6, 2003, one of Topazian's doctors noted that Topazian had lumbar IV disc syndrome and chronic pain on the left, and that Topazian had a prescription for Oxycontin as of April 2, 2003. (Def. St. ¶ 18.)

16. On September 9, 2003, another of Topazian's doctors noted that he had experienced good relief of symptoms following his surgery, but for the last two years he had been

5

having persistent back pain and had to take Oxycontin on a regular basis to control the pain. (Def. St. ¶ 19.)

17. Topazian also had a prescription for Skelaxin, a muscle relaxant, at various times during 2003 through 2006. (Def. St. ¶ 20.)

18. In January 2004, Topazian was referred to a comprehensive back rehabilitation program. (Pl. St. ¶ 19.)

19. According to a February 29, 2008, lab report, Plaintiff had oxycodone and benzodiazepines in his system on February 28, 2008. (Def. St. ¶ 21.)

20. On September 24, 2008, Topazian was referred for EMG/NCV studies of his lower extremities due to increased pain in his left lower back and numbness in his left leg. Topazian reported that one month prior to the studies, he developed increased pain in the left lower back and numbness in the left leg and foot. A few days prior to the studies, he developed pain in the left hip area as well. (Pl. St. ¶ 20.) The studies evidenced left S1 radiculopathy and polyneuropathy. (Pl. St. ¶ 20; Def. St. ¶ 22.)

21. An MRI performed on September 25, 2008 showed postsurgical changes on the right at L5-S1. (Pl. St. ¶ 20.) It showed a very large central herniated disc at L4-5 and L5-S1 with significant disc degeneration at both levels. (Def. St. ¶ 23.)

22. A physician's note from September 30, 2008, indicated that Topazian had done reasonably well with his right leg symptoms, but that he had been dealing with low back pain which could be recurrent with prolonged sitting for the past several years. (Pl. St. ¶ 21.) The note indicated that he had been seeing a physician for pain management and taking Oxycontin to deal with his pain. (Def. St. ¶ 24.) It also indicated that about five weeks earlier, Topazian began having severe pain in his

6

lower back and left leg, along with weakness and numbness in his left leg. (Pl. St. ¶ 21.)

23. Topazian's physician recommended surgery for Topazian's "condition at this time." (Pl. Resp. ¶ 24.) He recommended a laminectomy, decompression at both L4-5 and L5-S1, and "consideration of fusion because of his long-standing diskogenic back pain and disc degeneration." (Def. St. ¶ 24; Aetna Topazian Claim 819.)

24. A physician's note from October 8, 2008, indicated that Topazian had "been on long-term narcotic use for his back pain," including the use of Oxycontin, Percocet, Valium, Skelaxin, Ritalin, and Ambien. (Def. St. ¶ 25.)

25. On October 9, 2008, Topazian underwent surgery that consisted of an L4-5 laminectomy, L4-5 and L5-S1 foraminotomies, L4-S1 fusion, and diskectomies at L4-5 and L5-S1. (Def. St. ¶ 26; Pl. St. ¶ 22.) The operative report indicated that Topazian had a history of back surgery approximately 10 years prior for a right feathered laminotomy and microdiskectomy, had "done well" for a period of 10 years, and was now presenting with "acute onset" left foot drop and deteriorated motor function as well as paresthesias and pain. (Pl. St. ¶ 22.)

26. On October 24, 2008, Topazian had a follow up examination. He had progressive pain in his left thigh and leg and was taking medication for pain management. His foot drop and weakness had not improved from the surgery. (Pl. St. ¶ 23; Def. St. ¶ 27.)

27. On May 19, 2009, Topazian ceased working and submitted a claim for short-term disability benefits on May 20, 2009. (Def. St. ¶ 30.) In his claim, he identified his condition as "chronic back, nerve, spine disability." (Pl. Resp. ¶ 30.) His pain

7

management physician filled out a form attached to his claim, which asked, among other things, "Has this patient ever had the same condition or a similar condition?" (Aetna Topazian Claim 824). The physician responded, "Yes," and wrote, "He has had chronic back + leg pain. He had first back surgery in 2000." (Aetna Topazian Claim 824.)

28. Topazian received short-term disability benefits until August 2009. He also applied for LTD benefits, as his short-term benefits were exhausted in August. (Def. St. ¶ 30.)

29. On July 29, 2009, Aetna wrongly determined that Topazian's effective date of coverage was January 1, 2009, and denied his claim for LTD benefits on the grounds that he was requesting benefits for a pre-existing condition as a result. (Def. St. ¶ 31.)

30. After receiving notification from his employer that his effective date of coverage was actually May 30, 2008, Aetna told Topazian that they were once again investigating whether he was subject to a pre-existing condition limitation based on this revised effective date. (Def. St. ¶ 32; Aetna Topazian Claim 291.)

31. In response to a request by Aetna to clarify information regarding Topazian's condition, Topazian's pain management physician, Dr. Timothy Lubenow, sent Aetna a letter on October 1, 2009. The letter indicated that Topazian had undergone back surgery 10 years earliers which was unrelated to his most recent back surgery. Dr. Lubenow reported that prior to the onset of the symptoms that led to left side spine surgery, Topazian was able to sit and stand for prolonged periods of time, ambulate several blocks without any problems, and only experienced increased severity of pain with heavy increases in activity. Dr. Lubenow further stated that Topazian was in his

8

"usual state" of health until approximately August or September of 2008, at which time he had a sudden onset of severe left radicular back pain. Dr. Lubenow explained that Topazian underwent a posterior fusion in October 2008 but developed a "foot drop" and a post back surgery syndrome, rendering him unable to sit or stand for greater than 30-45 minutes at a time, and unable to ambulate more than one block. (Pl. St. ¶ 24.)

32. In a letter dated November 25, 2009, Aetna denied Topazian's claim for LTD benefits. The letter states that the LTD benefits were denied based upon medical documentation that showed that Topazian received treatment for the condition currently causing his disability. More specifically, the letter referenced the February 29, 2008 lab report indicating that Topazian had oxycodone in his system on February 28, 2008. The letter also noted that physician notes from September and October indicating that Topazian used oxycodone for low back pain. (Def. St. ¶ 36.)

33. On May 11, 2010, Topazian appealed his denial of benefits. (Def. St. ¶ 38.) Topazian conceded that he had a history of low back pain, but argued that his disability was the result of a new condition that developed as a result of complications following his October 2008 surgery. (Aetna Topazian claim 629-637.)

34. Aetna retained Dr. Mitchell Johnson, a board-certified orthopedic surgeon, to review Topazian's medical file review. (Def. St. ¶ 39.) Aetna asked Dr. Johnson, "In your opinion, does the claimant have a new condition since his surgery in October 2008?" In a report from June 2010, Dr. Johnson responded as follows:

> No, the claimant does not have a new condition since the October, 2008 surgery. The submitted clinical records indicate the claimant has a long standing history of low back disease with identified degenerative disc disease at L4-5 and L5-S1 with a significant disc herniation on the right at

9

L5-S1. The claimant was ultimately taken to surgery on 05/11/00, which resulted in right sided L5-S1 microdiscectomy. Postoperatively, the claimant had period of relief and subsequently developed recurrent symptoms, which resulted in performance of L4-5 laminectomy, L4-5, L5-S1 foraminotomy, L4-5, L5-S1 posterolateral fusion with instrumentation with discectomies at L4-5 and L5-S1. Postoperatively the claimant had continued back pain with continued left foot drop, which was present prior to surgery. The claimant subsequently developed failed back surgery syndrome, and there has been no clinical change in his condition since surgery. It is therefore opined, his immediate postoperative diagnosis when evaluated on 10/24/08 is consistent with failed back surgery syndrome. The record does not indicate the claimant had any significant relief. His symptoms acquiesced. He continued to have residual foot drop with continued reports of pain requiring chronic pain management. It is therefore opined the claimant did not suffer a new condition since his surgery from October, 2008.

(Pl. St. ¶ 25.)

35. Aetna also retained Dr. Lawrence Blumberg, another board-certified orthopedic surgeon, to review Topazian's file. (Pl. St. ¶ 26; Def. St. ¶ 40.) Aetna asked Dr. Blumberg, "Based on the records: Can you please state specifically if the conditions herniated disc, radiculopathy, degenerative disc, post laminectomy syndrome were caused by or contributed to by a pre-existing condition? And, if either condition was diagnosed, if services were received, or if medications were prescribed or recommended for each condition?" Dr. Blumberg responded as follows:

> Based on the records, the claimant had a herniated disk, radiculopathy, a degenerative disk, and post laminectomy syndrome which was a preexisting condition extending back into the 1990's. He underwent treatment off and on for this condition, including taking medication and eventually underwent operative intervention in 10/2008. He was taking medication for his problem and receiving the treatment as noted in the records. The condition for which he presently suffers is a continuation of his preexisting condition of L4-L5 and L4-L5 disk disease. He has a natural progression of the condition for which he underwent a microdiskectomy at L5-S1. He was taking medication and receiving treatment off and on. He was taking OcyContin and other medications. Therefore, as stated before, based on the records, he had a preexisting condition for which he was receiving treatment before the end of the first

> 12 months before the effective date of coverage (5/30/08-12/30/08), and it was diagnosed and treated as a preexisting condition during the three months before the effective date of coverage (1/1/09-5/20/09).

(Aetna Topazian Claim 625.)

36. Aetna upheld its claim denial on appeal, and communicated the final decision to Topazian's counsel via letter on July 15, 2010. The letter rejected Topazian's contention that his disabling condition was different from his prior back problems and stated that Aetna had determined that Topazian's conditions were all pre-existing because Topazian "was receiving treatment from several different doctors, taking medication, and had undergone multiple surgeries prior to his effective date of coverage." (Def. St. ¶ 41.)

37. Topazian has exhausted Aetna's appeal process regarding its decision to deny his claim on the basis of the pre-existing condition exclusion. (Pl. St. ¶ 16.)

### III. Analysis

Topazian bases his argument that Aetna's decision was arbitrary and capricious mainly on his claim that he currently suffers from failed back surgery syndrome, a new condition unrelated to the back problems he has suffered from since 1998. He argues that his most recent back surgery was the result of a new problem with lower back and leg pain on his left side, and that his surgery caused complications that have rendered him unable to work.

His second argument is that even if Aetna was reasonable in concluding that his current condition is related to his previous back problems, the pre-existing condition exclusion does not apply because he did not receive treatment for his back problems during the three-month "look back period" contemplated by the pre-existing condition provision of his policy. Topazian argues that the three-month period ran from March 1, 2008 to May 29, 2008.

The Court finds that Aetna's decision was not arbitrary and capricious. The medical evidence indicates that Topazian has long suffered from problems in the lower lumbar region of his spine, specifically in the L4-L5 and L5-S1 regions. It is true that the precise nature of those problems has changed over time. At first, it seems Topazian suffered more from pain on his right side, and now his problems seem to be mainly on his left side. But, Topazian has suffered from problems on his left side at least since 2003, years before he obtained coverage under his current policy. (Findings of fact, ¶ 15.) It is also true that Topazian's most recent back surgery seems to have failed to alleviate his symptoms, and possibly even caused new problems that are especially debilitating. But, this does not mean that his current disability was not "caused or contributed to" by his long-standing back problems.

Dr. Lubenow suggested that Topazian was in his "usual state" of health prior to September 2008, when he began to have severe pain on his left side, and added that he thought Topazian's recent problems were unrelated to his previous back surgery. Even accepting these statements as true, however, does not necessarily undermine the conclusions of Drs. Johnson and Blumberg. Topazian may have been in a "usual state" of reasonably managing chronic lower back problems through the use of narcotics such as oxycodone. While his most recent problems may not have been directly related to his previous surgery, that does not mean that they were unrelated to his longstanding problems that made that surgery necessary. Indeed, Topazian's surgeon indicated that at least part of the 2008 surgery, the fusion, should be done "because of his long-standing diskogenic back pain and disc degeneration." (Findings of fact, ¶ 23.) Aetna did not act unreasonably in heeding the opinions of its retained physicians, who concluded that Topazian's present condition was simply a progression in his history of disk disease.

Topazian argues that even if there is a relationship between his prior back problems and those caused by his surgery, the link is too attenuated to qualify under the pre-existing condition provision. He points to *Fought v. Unum Life Insurance Company of America*, 379 F.3d 997 (10th Cir. 2004), *abrogated on other grounds by Glenn*, 554 U.S. at 116-17, 128 S. Ct. 2351, for support. In *Fought*, the Tenth Circuit Court of Appeals overturned an insurer's application of a similar pre-existing condition clause because the insurer employed a "but/for causation" analysis that was "attenuated to the point of absurdity" in order to come to its conclusion. *Id.* The court described this analysis as follows:

> but for the pre-existing coronary artery disease, Ms. Fought probably would not have the surgery; but for the surgery, Ms. Fought would not have had a surgical wound; but for the surgical wound, Ms. Fought's previously undetectable osteoporotic sternum would not have prevented her doctors from closing her wound in a more conventional manner, which might have given the wound greater stability and resistance to the lateral tension in the wound exerted by Ms. Fought's large breasts; but for the combination of the surgical wound, Ms. Fought's osteoporotic sternum and her large breasts, the wound probably would not have dehisced, thereby providing an entry point for the staph infection several weeks after the surgery; and, but for the fact that the staph infection was resistant to antibiotics, entered Ms. Fought's bloodstream, and eventually spread to other parts of her body, Ms. Fought would not be disabled.

*Id.* at 1009-10. Noting that there were "at least five intervening stages between the pre-existing coronary artery disease and the disability," the court held that to accept the insurer's contention "would effectively render meaningless the notion of the pre-existing condition clause by distending the breadth of the exclusion." *Id.* at 1010.

Topazian's case is easily distinguishable from *Fought*. While Topazian's condition may have changed as a result of his most recent surgery, it was not unreasonable for Aetna to conclude that this was merely an exacerbation of a previous condition, not an entirely new one.

The plaintiff in *Fought* suffered from a post-surgical infection that was only related to her pre-existing coronary artery disease through a drawn out, unfortunate chain of events. Aetna, on the other hand, had sufficient evidence to determine that Topazian's troubles both prior to and following surgery were symptomatic of an ongoing disk disease affecting his lower back.

Having decided that Aetna had a reasonable basis for determining that Topazian's current condition was caused or contributed to by his chronic back condition, the Court turns next to Topazian's argument that he did not receive treatment for his condition during the look-back period. Topazian's argument is based primarily on his contention that the look-back period, defined by his policy as "the three months before [his] effective date of coverage," began on March 1, 2008. He notes that the look-back period would therefore include all of March, all of April, and most of May, as his coverage became effective on May 30. Aetna, on the other hand, argues that the period began on February 1, 2008. Aetna interprets "the three months before" to mean the three calendar months preceding the month in which Topazian's coverage went into effect. The parties engage in this argument primarily for the purpose of determining whether Aetna was permitted to consider the fact that a lab report revealed oxycodone in Topazian's system on February 28, 2008.

Under the policy, Aetna is entitled to interpret ambiguous terms in its policy. This term does seem to be somewhat ambiguous. For instance, because February 2008 only had 29 days, one might conclude that the date 3 months after February 28, 2008 was May 28, 2008. On the other hand, the answer is not as clear when the question is what date falls three months before May 30, 2008, the penultimate day in May. Under the arbitrary and capricious standard, Aetna's interpretations must be reasonable. In this case, Aetna's interpretation of the term seems to be somewhat of a stretch, as the term refers to the period before the effective *date* of coverage, not

to the period before the month containing the effective date. However, it does not seem to be an arbitrary and capricious decision, given that Aetna's construction does provide a way out of the dilemma noted above. Still, this would mean that Aetna would not have considered a condition to be pre-existing if Topazian received treatment for it earlier in May, but not in February, March, or April.

Indeed, even accepting Topazian's conclusion that the look-back period must be determined by looking back from the effective date, rather than the month of May, it is still not unreasonable to conclude that February 28 should be included. Given that Topazian's coverage took effect on May 30, the penultimate day of May, it is reasonable to conclude that the look-back period extended back at least to the penultimate day of February, three months earlier.

Given that Aetna included February 28 in its look-back period, it had evidence that Topazian was taking oxycodone during that period. It also had evidence from multiple sources that Topazian had been taking oxycodone and other pain killers for the past few years in order to manage the pain in his lower back. Based on this evidence, it was not unreasonable for Aetna to conclude that Topazian was "[taking] drugs or medicines prescribed or recommended by a physician" for his pre-existing condition during the look-back period. Thus, Aetna did not abuse its discretion in denying Topazian LTD benefits as a result of the pre-existing condition exclusion.

The Court finally addresses Topazian's claim that Aetna "moved the target," thereby exposing the influence of its inherent conflict of interest. As noted in the findings of fact, Aetna immediately revised its decision upon receiving notification that it had used the wrong effective date of coverage. In addition, Aetna has from the very beginning based its conclusion on the fact that Topazian was taking prescription pain killers for his chronic back pain during the look-back

period. That is still Aetna's position now. It does not seem to have improperly shifted its position in order to deflect Topazian's arguments. Thus, the Court does not find that there is evidence of bias significant enough to affect its application of arbitrary and capricious review.

## *CONCLUSION*

For the above reasons, the Court GRANTS Defendant's motion for judgment and DENIES Plaintiff's motion for judgment. The Court therefore enters judgment in favor of Defendant and against Plaintiff.

IT IS SO ORDERED.

_8/1/11_
Dated

Hon. William J. Hibbler
United States District Court